**THIS OPINION HAS NO PRECEDENTIAL VALUE. IT SHOULD NOT BE CITED OR RELIED ON AS PRECEDENT IN ANY PROCEEDING EXCEPT AS PROVIDED BY RULE 268(d)(2), SCACR.**

**THE STATE OF SOUTH CAROLINA**
**In The Court of Appeals**

The State, Respondent,

v.

Travontae Jahwan Mitchell, Appellant.

Appellate Case No. 2023-001323

―――――――――

Appeal From Horry County
Benjamin H. Culbertson, Circuit Court Judge

―――――――――

Opinion No. 2026-UP-405
Heard December 9, 2025 – Filed August 12, 2026

―――――――――

**AFFIRMED**

―――――――――

Appellate Defender Joanna Katherine Delany, of Columbia, for Appellant.

Attorney General Alan McCrory Wilson, Deputy Attorney General Donald J. Zelenka, Senior Assistant Deputy Attorney General Melody Jane Brown, and Assistant Attorney General Tommy Evans, Jr. all of Columbia, and Solicitor Jimmy A. Richardson, II, of Conway, all for Respondent.

―――――――――

**PER CURIAM:**  Travontae Mitchell (Appellant) appeals his convictions for murder and three counts of attempted murder for his involvement in the death of Jamie Johnson.  Appellant was one of six young men the State alleged had ambushed Johnson and his passengers.  He and each of his codefendants were sentenced to forty-five years imprisonment for murder and concurrent sentences of thirty years for each count of attempted murder.  Appellant appeals his convictions and sentences, alleging that the trial court erred in sentencing him without individualized consideration as a juvenile, denying his motion for a mistrial, admitting mugshots of Appellant and his codefendants, and admitting a statement from a non-testifying codefendant.  We affirm.

**BACKGROUND**

On September 12, 2020, Johnson was driving his Chevrolet Tahoe to a local Conway gas station accompanied by passengers Jacob Hill, Britney Milam, and Orlin Lopez.  A Chevrolet Caprice driven by Don Brown and occupied by Appellant, Tronahz Whittington, Che Ransom, Shamontae Graham, and Mikkie McLeod began following them.  Whittington spotted Johnson in the Tahoe and told Brown to follow him so they could rob him.  When the victims stopped at a stop sign, Brown drove the Caprice in front of the Tahoe, blocking its movement.  Whittington, along with three or four other young men who were seated in the back, got out of the Caprice and began shooting at the Tahoe.  Hill, Milam, and Lopez ducked down once the shooting began.  Johnson attempted to put the Tahoe in reverse, but when he turned to look behind him, he was shot in the back of the head and died at the scene.

The Tahoe was hit by two bullets.  One went through the windshield—killing Johnson—and the other hit the engine block.  Multiple shell casings were found at the scene.  Two casings were from an automatic rifle, and seven were fired from two different .9mm handguns.

All six of the men in the Caprice were charged with murder and attempted murder.  Whittington was tried first and found guilty.  He was sentenced to forty-five years for murder and concurrent thirty-year sentences for each count of attempted murder.  Appellant was sixteen at the time of the shooting and was waived up from family court to general sessions court.  Appellant, Ransom, and Brown were tried together. [1]  The jury found all three guilty of all charges and the trial court

---

[1] At the time of Appellant's trial, charges were still pending against Graham and McLeod.

sentenced them to forty-five years for murder and concurrent thirty-year sentences for each count of attempted murder.[2]

Appellant made a motion for the court to reconsider his sentence and a motion for a new trial. After a hearing on the post-trial motions, the trial court denied the motions and this appeal followed.

**LAW/ANALYSIS**

I.      Sentencing

Appellant argues that the trial court erred in sentencing him without giving him individualized consideration and without considering the mitigating factors of youth set forth in *Aiken v. Byars*, 410 S.C. 534, 765 S.E.2d 572 (2014).

During sentencing, Appellant's attorney argued:

> When this occurred, my client was 16 years old. He was a juvenile. As we know, people's brains aren't fully developed until they're at least 23, 24 years old . . . . He got wrapped up in a situation that absolutely got out of hand . . . . He was just trying to get home, riding with his brother, and the situation got out of control. Your Honor, he has been incarcerated now since 2020. He's not seen his family since then . . . . As you're well aware, the primary shooter, the person that came up with this plan, was sentenced to 45 years just a few months ago . . . . My client is now 19. And as you know, any sentence you can impose here today, even the mandatory minimum, is longer than my client's even been on this planet . . . . We'd respectfully ask if you would consider the minimum on this case and show any kind of leniency you can, Your Honor.

Appellant's mother was the only witness called in mitigation. She told the court Appellant was not a bad child, that he played baseball, and that he had been baptized. The trial court told Appellant that he did not see any justifiable reason to

---

[2] All of the codefendants, including Tronahz Whittington, were teenagers at the time of the shooting.

impose a different sentence in his case from what Whittington received, and he gave all three codefendants the same sentence as Whittington.

Appellant filed a motion for sentence reconsideration without citing any grounds for the motion. At the sentence reconsideration hearing, his attorney emphasized Appellant's young age at the time of the shooting, his waiver from family court, and the inconsistencies in the trial testimony. No witnesses testified in mitigation, and counsel made no mention of *Aiken* or the mitigating factors of youth.

"When considering whether a sentence violates the Eighth Amendment's prohibition on cruel and unusual punishments, the appellate court's standard of review extends *only to the correction of errors of law*." *State v. Mack*, 441 S.C. 526, 535, 894 S.E.2d 820, 825 (Ct. App. 2023) (quoting *State v. Finley*, 427 S.C. 419, 423, 831 S.E.2d 158, 160 (Ct. App. 2019)). "[T]his court will not disturb the circuit court's findings absent a manifest abuse of discretion." *Id.* "[A]buse of discretion occurs when the circuit court's finding is based on an error of law or grounded in factual conclusions without evidentiary support." *Id*. at 535–36, 894 S.E.2d at 825.

"The United States Supreme Court sequentially has interpreted the protections of the Eighth Amendment to hold that juveniles are entitled to different treatment in sentencing when the death penalty or a life-without-parole sentence is imposed." *Jones v. State*, 440 S.C. 14, 26, 889 S.E.2d 590, 597 (2023). In *Roper v. Simmons*, the United States Supreme Court held that sentencing juvenile offenders (under the age of eighteen) to death violated the Eighth Amendment's prohibition against cruel and unusual punishment. 543 U.S. 551, 578–79 (2005). The Court expanded upon *Roper* in *Graham v. Florida*, where the Court held that life sentences for juveniles who had committed nonhomicide crimes were unconstitutional. 560 U.S. 48, 82 (2010). *Miller v. Alabama* further held that mandatory sentences of life without the possibility of parole (LWOP) for minors violated the Eighth Amendment. 567 U.S. 460, 470 (2012).

Although South Carolina does not mandate an LWOP sentence for murder, our supreme court nonetheless held that *Miller* established "an affirmative requirement that courts fully explore the impact of the defendant's juvenility on the sentence rendered" before sentencing a juvenile to LWOP. *Aiken*, 410 S.C. at 543, 765 S.E.2d at 577. The court held that sentencing judges may still sentence a juvenile to LWOP, but they may do so only after an individualized hearing where the judge considers

> (1) the chronological age of the offender and the hallmark features of youth, including "immaturity, impetuosity, and failure to appreciate the risks and consequence[s]"; (2) the "family and home environment" that surrounded the offender; (3) the circumstances of the homicide offense, including the extent of the offender's participation in the conduct and how familial and peer pressures may have affected him; (4) the "incompetencies associated with youth . . ."; and (5) the "possibility of rehabilitation."

*Id*. at 544, 765 S.E.2d at 577 (quoting *Miller*, 567 U.S. at 477–78).  Thus, the court held that whether the sentence is mandatory or permissible, a juvenile offender is entitled to the same constitutional protections before receiving an LWOP sentence.

In *State v. Slocumb*, our supreme court declined to extend the *Roper-Graham-Miller* and *Aiken* rationales to aggregate sentences for multiple offenses amounting to a *de facto* life sentence for a juvenile.  426 S.C. 297, 314–15, 827 S.E.2d 148, 157 (2019).  The court in *Slocumb* upheld a juvenile's aggregate sentence of one hundred and thirty years for nonhomicide offenses, finding "only the [U.S.] Supreme Court may extend and enlarge the protections guaranteed by the United States Constitution."  *Id*. at 299, 827 S.E.2d at 149.

After Appellant's trial (and prior to the hearing on Appellant's motion for sentence reconsideration), our supreme court decided *Jones*.  While not requiring an "individualized hearing" for sentences other than LWOP, the court specifically instructed circuit courts to consider the factors of youth when "sentencing juveniles falling under the ambit of subsection 63-19-20(1) [of the South Carolina Code]." *Jones*, 440 S.C. at 29, 889 S.E.2d at 598.[3]  The court stated, "[co]nsideration of these factors can be done at sentencing; therefore, a separate *Aiken* hearing is not required."  *Id*. at 19, 889 S.E.2d at 593.

Appellant argues the trial court erred when it failed to conduct an individualized hearing in his case because his conviction carried the *possibility* of an LWOP sentence.  He maintains that he is entitled to an individualized hearing on remand, even though such a sentence was not imposed.  He further argues the court did not consider the *Aiken* factors on the record as the court instructed in *Jones*.  While these arguments carry some force, we find no error under these circumstances.

---

[3] Section 63-19-20(1) of the South Carolina Code (2010 & Supp. 2025) is the definitional statute of the Juvenile Justice Code and defines "child" and "juvenile."

First, as our supreme court stated in *Aiken*, "*Miller* requires that before a life without parole sentence *is imposed* upon a juvenile offender, he must receive an individualized hearing where the mitigating hallmark features of youth are fully explored." *Aiken*, 410 S.C. at 545, 765 S.E.2d at 578 (emphasis added). However, in this case Appellant did not receive an LWOP sentence nor did the State seek LWOP.

Second, Appellant did not request an individualized sentencing hearing, nor did he present the judge with anything but the barest of information relevant to the *Aiken* factors. Appellant set forth no grounds in his written motion for sentence reconsideration, nor did he present any testimony or evidence relevant to the *Aiken* factors at the reconsideration hearing. In fact, Appellant did not reference *Aiken* or *Jones* at the reconsideration hearing. In both the initial sentencing phase and on reconsideration, the trial court gave Appellant a full opportunity to present mitigating evidence. Having given the trial court no relevant information to consider, we find no error of law in the court's sentence.

II.     Motion for a Mistrial

Appellant contends that the trial court erred in denying his motion for a mistrial following Shamontae Graham's testimony referencing a second shooting. We disagree.

"The decision to grant or deny a mistrial is within the sound discretion of the trial court. The trial court's decision will not be overturned on appeal absent an abuse of discretion amounting to an error of law." *State v. Harris*, 382 S.C. 107, 117, 674 S.E.2d 532, 537 (Ct. App. 2009) (citation omitted). "A mistrial should only be granted when absolutely necessary, and a defendant must show both error and prejudice in order to be entitled to a mistrial." *State v. Wilson*, 389 S.C. 579, 585–86, 698 S.E.2d 862, 865 (Ct. App. 2010). "Insubstantial errors that do not impact the result of the case do not warrant a mistrial when guilt is conclusively proved by competent evidence." *Id.* at 586, 698 S.E.2d at 865 (quoting *State v. White*, 371 S.C. 439, 447–48, 639 S.E.2d 160, 164 (Ct. App. 2006)). "The determination of prejudice must be based on the entire record and the result will generally turn on the facts of each case." *Id.* at 586, 698 S.E.2d at 865–66 (quoting *White*, 371 S.C. at 447, 639 S.E.2d at 164).

The State argued at trial that the attack on Johnson was planned and that Whittington, Appellant, and Ransom were the shooters. Appellant's defense at trial was that he was present in the Caprice but did not have a gun or participate in the shooting.

Two officers who separately interviewed Appellant testified to the statements Appellant made to law enforcement. The first detective testified that Appellant initially denied being in the Caprice at all and claimed he was at his mother's house at the time of the shooting. The second detective testified that after confronting Appellant about discrepancies in his alibi, Appellant admitted to being in the middle back seat of the Caprice and to exiting the vehicle as the shooting started. However, Appellant claimed he got right back into the vehicle and that he never possessed nor fired a weapon at any point in the altercation.

There was conflicting testimony about how many men exited the vehicle at the time of shooting and which of the Caprice's occupants fired weapons. The surviving victims all testified that Whittington was the shooter who got out of the front seat of the Caprice. Their testimony differed regarding the number of young men who got out of the backseat and fired at them. Milam testified that one of the shooters from the backseat was wearing white pants and holding a short gun, and another had a distinguishing mark on his face. She admitted, however, that she couldn't see which men discharged their guns because she ducked down before shots were fired. Lopez testified that he recognized Whittington as one of the shooters, but he was unable to identify any of the others.

Graham—who is Appellant's brother—was a witness for the State. He testified that he, Brown, and Whittington were in the front seats, and that Ransom, McLeod, and Appellant were in the back. Graham denied that there was any prior plan or agreement among the group to rob Johnson. He claimed that it was Whittington who told Brown to start following Johnson because Whittington wanted to rob him. Graham testified that the only ones who exited the vehicle were Whittington, Ransom, McLeod, and Appellant, but later clarified that Appellant "stepped out of the car and quickly got back in."

Graham testified on direct that he, Ransom, McLeod, and Whittington were the only ones in the Caprice who had guns.[4] He denied seeing Appellant with a gun and the State did not elicit any further testimony from him on this issue or seek to impeach him with his previous testimony at Whittington's trial. On cross-examination, Ransom's attorney questioned Graham about his prior testimony at Whittington's trial, asking, "Have you testified before that [Appellant] had a handgun?" To which Graham responded, "No, sir." Ransom's counsel then

---

[4] McLeod also testified for the State. He claimed he saw Whittington shoot and kill Johnson and that Appellant and Ransom also shot at the Tahoe.

clarified, "Did you testify in [Whittington's] trial that your brother had a handgun?" To which Graham responded, "No, sir." Ransom's counsel then showed Graham the transcript of his testimony at Whittington's trial. After reading the excerpt, Graham admitted that he *had* testified Appellant had a handgun but clarified: "I didn't know he had it at the scene. I found out he had a gun *at the second scene where me and my family was attacked*, and they asked me questions about both interviews." Appellant's attorney made no objection.

Appellant's attorney then followed up on cross-examination with questions about whether Graham saw Appellant with a gun, stating, "You also testified yesterday that you didn't see [Appellant] with a gun at all, did you?" Graham replied, "Not at the scene, no, I did not." Graham testified again that he had no knowledge his brother had a gun, didn't see him with a handgun in his hand, and didn't see him fire a shot at the Tahoe.

On redirect, the solicitor questioned Graham further about his previous testimony at Whittington's trial, stating, "Now there was a lot of talk with [Appellant's counsel] about your brother Travontae Mitchell, correct? . . . And he showed you an excerpt from the last time you testified; is that correct? . . . And what did it say that you said about Travontae Mitchell?" Graham responded, "He had a small handgun." The solicitor then asked, "And so now, all of a sudden, this time you're saying he didn't have a gun?" Graham replied, "Well, it was kind of asked funny in that trial because they were both—were also talking *about the second shooting that happened out on 501*—." Appellant's attorney objected and the trial court sustained the objection. Outside of the jury's presence, the trial court instructed the solicitor, "Don't get into the second incident."

When redirect resumed, the solicitor again asked Graham whether, looking at the transcript from Whittington's trial, he did previously testify that Appellant had a gun. Graham responded again, "I didn't see it on the scene, *but the second incident that's not related*, that's when I know . . ." Appellant's attorney again objected and moved for a mistrial. The trial court denied Appellant's motion for a mistrial and instructed the jury to disregard Graham's response.

We find the trial court did not abuse its discretion in denying the motion for a mistrial. At the time Appellant's counsel objected to the testimony, Graham had already offered testimony that his brother had a handgun at a second scene which he described as an attack on his family. Considering this previous testimony, admitted without objection, we do not find that his later description of a "second shooting" or a "second incident" warranted a mistrial. *See State v. Dial*, 405 S.C.

247, 257, 746 S.E.2d 495, 500 (Ct. App. 2013) ("The granting of a motion for a mistrial is an extreme measure that should only be taken if an incident is so grievous that the prejudicial effect can be removed no other way." (quoting *State v. Wiley*, 387 S.C. 490, 495–96, 692 S.E.2d 560, 563 (Ct. App. 2010))).

Furthermore, we find the trial court's instruction to the jury to disregard the testimony sufficient to cure any error given the lack of details and Graham's characterization of the second scene as an attack on his family. *See State v. Smith*, 290 S.C. 393, 395, 350 S.E.2d 923, 924 (1986) ("An instruction to disregard incompetent evidence is usually deemed to have cured the error unless on the facts of the particular case it is probable that, notwithstanding the instruction, the accused was prejudiced.").

III.     Booking Photographs

The State introduced booking photographs of the codefendants through the testimony of a detention center employee. Appellant argues the trial court erred in admitting the photographs into evidence because they were irrelevant and prejudicial. We disagree.

All relevant evidence is admissible. Rule 402, SCRE. "'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Rule 401, SCRE. "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice . . . ." Rule 403, SCRE.

"The relevancy, materiality, and admissibility of photographs as evidence are matters left to the sound discretion of the trial court." *State v. Nance*, 320 S.C. 501, 508, 466 S.E.2d 349, 353 (1996). "If the offered photograph serves to corroborate testimony, it is not an abuse of discretion to admit it." *Id.* "When juxtaposing the prejudicial effect against the probative value, the determination must be based on the entire record and will turn on the facts of each case." *State v. Lyles*, 379 S.C. 328, 338, 665 S.E.2d 201, 206 (Ct. App. 2008). "The introduction of a 'mug-shot' of a defendant is reversible error unless: (1) the state has a demonstrable need to introduce the photograph, (2) the photograph shown to the jury does not suggest the defendant has a criminal record, and (3) the photograph is not introduced in such a way as to draw attention to its origin or implication." *State v. Ford*, 334 S.C. 444, 450, 513 S.E.2d 385, 388 (Ct. App. 1999).

We find no reversible error in the decision to admit the photographs. The State demonstrated a need to introduce photos of the defendants taken close in time to the shooting to corroborate the witnesses' descriptions of the shooters. Because the trial took place three years after the shooting, Appellant's appearance at trial may have changed substantially from the "youthful" appearance described by the witnesses three years prior. Additionally, we find little prejudice because the jury was aware that Appellant had been arrested for the crimes in this case. Finally, the trial court informed the jury that none of the defendants had a "RAP sheet" (outside of the crimes they were on trial for), stating, "[I] do need to let you know that the parties have stipulated, which is a fact that you must accept during this case, is that none of these three defendants have a RAP sheet, and therefore, any alleged alias could not have come from a RAP sheet because none of them have a RAP sheet." *See Ford*, 334 S.C. at 450, 513 S.E.2d at 388 (finding a line-up including a photo of the appellant was admissible "because the state had a demonstrable need to introduce the photos and because there was nothing about the photographs or the way they were introduced that suggested [the appellant] had a prior criminal record"). Any concerns that the jury would draw an improper conclusion that Appellant had a criminal record were alleviated by the trial court's statement to the jury informing them that Appellant did not have a "RAP sheet."

IV.    Ransom's Confession

Appellant argues that the admission of codefendant Che Ransom's confession referencing a plan to rob the victim violated his rights under the Sixth Amendment's Confrontation Clause. We disagree.

Over Appellant's objection, the interviewing officer testified to statements Ransom made to police. Ransom admitted that he was in the Caprice with a .9mm handgun and that he got out of the vehicle, attempted to shoot, but got back into the vehicle without firing because his gun jammed. He then "racked the slide" and fired a few shots out of the window as the Caprice drove away. Ransom further confessed he knew Johnson from Snapchat and knew that Johnson had "weed money," so he formulated a plan to "rob him for money and/or weed." During cross-examination by Ransom's attorney, the officer testified that Ransom claimed Whittington was the one who came up with the plan and that the plan originated after "they" got in the vehicle.

"The Confrontation Clause of the Sixth Amendment, extended against the States by the Fourteenth Amendment, guarantees the right of a criminal defendant 'to be confronted with the witnesses against him.'" *State v. McDonald*, 412 S.C. 133,

139, 771 S.E.2d 840, 843 (2015) (quoting *Richardson v. Marsh*, 481 U.S. 200, 206 (1987)).  This constitutional right "include[s] the right to cross-examine those witnesses." *Pointer v. Texas*, 380 U.S. 400, 401 (1965).

The United States Supreme Court has issued a line of decisions analyzing when the admission of a non-testifying codefendant's confession violates an appellant's Confrontation Clause rights.  The leading case, *Bruton v. United States*, 391 U.S. 123 (1968), held that a statement "that implicates the defendant . . . during a joint trial" violates an appellant's Confrontation Clause rights.  *McDonald*, 412 S.C. at 139, 771 S.E.2d at 843 (citing *Bruton*, 391 U.S. at 127–28).  In *Bruton*, "[a] postal inspector testified that Evans orally confessed to him that Evans and petitioner committed the armed robbery." *Bruton*, 391 U.S. at 124.  The Court held:

> Not only are the incriminations devastating to the defendant but their credibility is inevitably suspect, a fact recognized when accomplices do take the stand and the jury is instructed to weigh their testimony carefully given the recognized motivation to shift blame onto others.  The unreliability of such evidence is intolerably compounded when the alleged accomplice . . . does not testify and cannot be tested by cross-examination.

*Id.* at 136.  The *Bruton* court acknowledged that there may be exceptions to the rule, noting that a potential solution may be redacting references to the participation of others in the crime.  *Id*. at 1334 n.10.

In *Richardson v. Marsh*, the United States Supreme Court held that a defendant's Confrontation Clause rights were not violated when a codefendant's confession was redacted to eliminate reference to the defendant's name and existence.  481 U.S. 200, 211 (1987).  Eleven years later, the Court decided *Gray v. Maryland* in which a defendant's name was redacted using the word "deleted" and inserting a blank space.  525 U.S. 185, 197 (1998).  The Court found this violated the defendant's Confrontation Clause rights because it "refers directly to the 'existence' of the non[-]confessing codefendant." *Id.* at 192.  The Court found that "redaction that replaces a defendant's name with an obvious indication of deletion, such as a blank space, the word 'deleted,' or similar symbol, still falls within *Bruton*'s protective rule." *Id.*  The Court noted that "the obvious deletion may well call the jurors' attention specially to the removed name." *Id.* at 193.

South Carolina precedent follows this line of cases.  *See State v. Holder*, 382 S.C. 278, 285, 676 S.E.2d 690, 694 (2009) (finding the admission of a non-testifying

codefendant's confession replacing the defendant's name with "she" violated the Confrontation Clause "because the jury could readily determine that the statement referred to [the defendant] as she was the only female defendant"); *State v. Henson*, 407 S.C. 154, 166, 754 S.E.2d 508, 514 (2014) (finding the admission of a non-testifying codefendant's confession replacing defendant's name with "the guy," "he," and "him" violated the Confrontation Clause because "the jury could infer from the face of [non-testifying codefendant's] confession without relying on any other evidence, that the confession referred to and incriminated [the defendant]").

Appellant argues Ransom's statement that he and Whittington formulated a plan after "they" were in the car implicated him in planning the crime because he was one of the occupants of the vehicle. But read in context, Ransom (through the investigator's testimony) specifically stated that Whittington spearheaded the plan and that Ransom participated with him in planning the robbery. He did not implicate anyone else in the planning. We do not understand his later use of the word "they" as reasonably implicating Appellant in planning the crime; only that the plan was formed after they all got in the Caprice.

Appellant admitted to law enforcement that he was in the vehicle at the time of the shooting, but he claimed he was only in the car to get a ride home. Ransom's statement that he and Whittington decided to rob Johnson *after* the group had already gotten in the car therefore bolstered Appellant's claim that he was not part of any advanced plan to rob Johnson and was merely "in the wrong place at the wrong time."[5] In this context, we find no *Bruton* violation. *See, e.g, United States v. Min*, 704 F.3d 314, 321 (4th Cir. 2013) (finding that a confession of a codefendant was admissible when it "did not implicate any one defendant in particular, nor did it leave the jury to fill in any obvious blanks."); *cf. McDonald*, 412 S.C. at 141, 771 S.E.2d at 844 (finding a *Bruton* violation where an admitted confession described the specific actions taken by the non-testifying codefendant and two other men during a trial with three male codefendants); *Henson*, 407 S.C. at 166, 754 S.E.2d at 514 (finding error in admitting a confession that redacted the defendant's name but named his three co-conspirators for a crime with four perpetrators).[6]

---

[5] McLeod likewise testified that Whittington was the only one in the group who knew Johnson and that it was Whittington's idea alone to rob him.

[6] Shortly after Appellant's trial, the United States Supreme Court decided *Samia v. United States* where a non-testifying codefendant's confession was redacted using the term "other person." 599 U.S. 635, 642 (2023). A divided Court found the defendant's Confrontation Clause rights were not violated "where (1) the

**CONCLUSION**

For the above reasons, Appellant's convictions and sentences are affirmed.

**AFFIRMED.**

**WILLIAMS, C.J., THOMAS, and CURTIS, JJ., concur.**

---

confession has been modified to avoid directly identifying the non[-]confessing codefendant and (2) the court offers a limiting instruction that jurors may consider the confession only with respect to the confessing codefendant." *Id.* at 640. The Court found that "historical practice suggests at least that altering a non[-]testifying codefendant's confession not to name the defendant, coupled with a limiting instruction, was enough to permit the introduction of such confessions at least as an evidentiary matter." *Id.* at 646.